UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **COLLEGE ESSAY OPTIMIZER, LLC,** d/b/a **COLLEGE ESSAY ORGANIZER,** and **METRO ACADEMIC PREP, INC.,**<br><br>Plaintiffs,<br><br>v.<br><br>**SIMPLE SOLUTIONS, INC.,**<br><br>Defendant. | Civ. No. 19-18410 (KM) (JBC)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

      Plaintiffs Metro Academic Prep, Inc. ("MAP") and College Essay Optimizer, LLC d/b/a College Essay Organizer ("CEO") commenced this action against defendant Simple Solutions, Inc. ("Simple Solutions") in September 2019. (DE 1.) The gist of the complaint is that Simple Solutions is liable for the loss of CEO's data that occurred when the server hosting CEO's website crashed in April 2019, rendering the website unusable. (DE 1.)[1] The complaint contains

---

[1] Certain citations to the record will be abbreviated as follows:

DE = Docket entry in this matter
Def. Mot. = Defendant's brief in support of its motion for partial summary judgment (DE 49-2)
Def. Opp. = Defendant's brief in opposition to plaintiffs' motion for partial summary judgment (DE 50)
Pl. St. = Plaintiffs' statement of undisputed material facts (DE 47-1)
Def. Resp. = Defendant's response to plaintiffs' statement of undisputed material facts (DE 50-1)
Def. St. = Defendant's statement of undisputed material facts (DE 49-1)
Pl. Resp. = Plaintiffs' response to defendant's statement of undisputed material facts (DE 51-1)
Stern Decl. = Declaration of Daniel Stern in support of plaintiffs' motion for partial summary judgment (DE 47-7)

1

six causes of action, including negligence and breach of contract. (*Id.*)

In December 2022, both parties moved for partial summary judgment. (DE 47, 49.) Those motions are now before the Court. For the reasons set forth below, the plaintiffs' motion for partial summary judgment (DE 47) is **DENIED** and the defendant's motion for partial summary judgment (DE 49) is **GRANTED IN PART** and **DENIED IN PART**.

## I.  Background

With noted exceptions, the following facts are undisputed. Daniel Stern is the sole owner, president, and chief executive officer of plaintiff MAP. (Pl. St. ¶1; Def. Resp. ¶1; Stern Decl. ¶1.) MAP offers academic support, test prep, and college admissions support primarily to high school students worldwide. (Pl. St. ¶4; Def. Resp. ¶4; Stern Dep. 15:3-10.) Stern is also the president and chief executive officer of plaintiff CEO, a separate company that was founded in 2008. (Stern Dep. 10:10-14.) MAP owns ninety percent of CEO, while the remaining ten percent is owned by non-party A-List Education. (Pl. St. ¶2; Def. Resp. ¶2.)

Until 2017, CEO operated a publicly accessible website which, among other things, aggregated and delivered to users supplemental questions in college admission applications. (Pl. St. ¶¶5-8; Def. Resp. ¶¶5-8.) Website users included college applicants, parents, school counselors, and independent consultants. (Pl. St. ¶3; Def. Resp. ¶3.) In 2017, CEO changed its business

---

Stern Opp. Decl. = Declaration of Daniel Stern in opposition to defendant's motion for partial summary judgment (DE 51-6)
Weeks Dep. = Deposition of Matthew Weeks (DE 49-10)
Cameron Dep. = Deposition of Keely Cameron (49-8)
Stern Dep. = Deposition of Daniel Stern (DE 49-5)
Israely Decl. = Declaration of Alon Israely in support of plaintiffs' motion for partial summary judgment (DE 47-10)
Greenspun Rep. = Report of Philip Greenspun (DE 50-3)
Morris Dep. = Deposition of Stephanie Morris (DE 49-7)
Agr. = Agreement between CEO and Simple Solutions dated June 2009 (DE 49-6)

model. (Pl. St. ¶6; Def. Resp. ¶6.) The tools on the CEO website were removed from public accessibility and remained available only to MAP employees, who utilized the CEO website as an operational, marketing, and lead generation tool. (Pl. St. ¶¶7-8; Def. Resp. ¶¶7-8.) Due to this change, CEO has not generated revenue for itself since 2017. (Stern Dep. 106:21-23.)

     Defendant Simple Solutions is a web design and development company owned by Jeremy and Keely Cameron. (Cameron Dep. 20:19-20; Weeks Dep. 21:5-27:14.) In addition to providing website coding and graphic design services, Simple Solutions helps clients select the technology on which a client's website will operate by offering advice and guidance as to the available options. (Weeks Dep. 22:1-24:3, 25:9-18.) This includes assistance with selecting a server to host the website. (*Id.* 26:22-27:6.) Simple Solutions does not maintain servers itself, but instead relies on a hosting company to provide that service to its clients. (*Id.* 27:10-14.)

     In June 2009, CEO entered into an independent contractor agreement ("the Agreement") with Simple Solutions. (DE 49-6.) In exchange for a monthly retainer, Simple Solutions agreed to build, design, maintain, and update the CEO website. (DE 49-6 at 5.) Simple Solutions also agreed to "maintain redundant backups of data (code/database) on a regular basis and provide CEO with the ability to download/receive code/database backups." (Id.)

     Stern testified that the contract was originally drafted as one between Simple Solutions and MAP, rather than Simple Solutions and CEO. (Stern Dep. ¶22:22-25.) According to Stern, he explained to Simple Solutions at the outset of the parties' relationship that MAP intended to mine CEO's data for marketing purposes. (Stern Opp. Decl. ¶10.) Stern further explained that in hiring a web developer to complete and manage its website, it was CEO's intent to benefit MAP because MAP relied on the data generated by the website and would suffer a significant loss if this data was destroyed. (Id. ¶11.) Although it is not entirely clear, Simple Solutions appears to dispute that the Agreement was originally drafted as between Simple Solutions and MAP. Simple Solutions points out that there is no documentary evidence of this earlier draft of the

contract (Def. St. ¶5), and MAP has its own website, which is managed by another company (Def. St. ¶9; Pl. Resp. ¶9).

Between 2009 and 2019, CEO relied on Simple Solutions to make changes and updates to the CEO website, including those changes required to convert the website to internal use only in 2017. (Pl. St. ¶13; Def. Resp. ¶13.) This work was mostly done by Matthew Weeks, a senior web developer at Simple Solutions. (Weeks Dep 21:5-9; Stern Dep. 36:6-9.)

The parties dispute whether the Agreement was terminated in 2013 in favor of an ad hoc working relationship. (Def. St. ¶11; Pl. Resp. ¶11.) From 2009 to 2013, CEO paid Simple Solutions a monthly retainer for its services pursuant to the Agreement. (Def. St. ¶10; Pl. Resp. ¶10.) In 2013, CEO stopped paying a monthly retainer and instead billed Simple Solutions for its time and materials on an as-needed basis. (Cameron Dep. 65:4-9; 69:1-5.) The Agreement provides that "[t]he Payment Schedule"—*i.e.*, the monthly retainer—"may be updated by the parties from time to time during the 'Term' upon the mutual written agreement of the Parties." (Agr. ¶3.) The parties never explicitly discussed whether the Agreement was terminated, and Stern evidently believed that it remained in effect throughout the course of the parties' working relationship. (Stern Opp. Decl. ¶¶18-19.)

At some point, CEO also began paying Simple Solutions an annual fee to act as the "interpreter" between CEO and the company that hosted its server, Lunarpages. (Cameron Dep. 69:8-24; Weeks Dep. 164:21-165:19.) This annual fee ranged from $350 to $500. (Cameron Dep. 69:13-15.) Simple Solutions communicated with Lunarpages on CEO's behalf and coordinated all server upgrades and maintenance with Lunarpages and CEO. (Pl. St. ¶12; Def. Resp. ¶12.) Stern testified that he communicated directly with Lunarpages only once, when an urgent issue arose in the middle of the night, and that Jeremy Cameron instructed him the next morning to contact Simple Solutions instead of Lunarpages with any future concerns. (Stern Dep. 27:21-30:5.)

At the beginning of the parties' relationship, the CEO website was hosted on a virtual private server. (Pl. St. ¶14; Def. Resp. ¶14.) This meant that the

4

website code was maintained on one server and the database containing the information served up by the website was maintained on a different server. (Pl. St. ¶15; Def. Resp. ¶15.) A copy of the code and/or the database was backed up on a remote server as well. (Pl. St. ¶16; Def. Resp. ¶16.)

In 2016, CEO's website code and database were moved to a dedicated server hosted by Lunarpages. (Pl. St. ¶17; Def. Resp. ¶17.) As part of this switch, the live website and database were placed on the same server. (Pl. St. ¶18; Def. Resp. ¶18.) Neither the website code nor the database was backed up externally on a separate server. (Pl. St. ¶21; Def. Resp. ¶21.) Instead, the server that stored CEO's information utilized an internal backup configuration called a mirrored RAID. (Pl. St. ¶22; Def. Resp. ¶22.) A mirrored RAID consists of two hard drives on the same server that mirror one another, such that data on one hard drive is automatically written onto the other. (Pl. St. ¶23; Def. Resp. ¶23.) This system is designed to ensure that if one drive fails, the server can run on the other. (Weeks Dep. 119-120.)

It is disputed whether Simple Solutions recommended that CEO switch to a dedicated server with a RAID configuration, or whether CEO chose this option from several provided by Simple Solutions. (Pl. St. ¶11; Def. Resp. ¶11.) It is also disputed whether Simple Solutions explained to CEO that, by making this switch, they would be relying solely on the mirrored RAID system on the server and that their data would not be backed up in a separate location. (Pl. St. ¶28; Def. Resp. ¶28.) Although Weeks could not recall Stern asking specifically whether there would still be a remote backup in place after the switch to a dedicated server, Weeks testified that he was very thorough in answering all of the questions that Stern had, and that he "would have made sure that [Stern] understood the differences between the architecture so that he could have made a decision about how to adjust things if he wanted to." (Weeks Dep. 112:22-113:16.) Stern testified, however, that he had very little knowledge or understanding of CEO's server needs (Stern Dep. 82:8-16) and that CEO "just relied on [Weeks] and his expertise" (*Id.* 93:12-14). According to Stern, when Weeks discussed with CEO the option of moving to a dedicated

5

server, "he never got into the nuts and bolts with us, because I think he understood that we didn't really get that or feel like we needed to get that." (Id. 93:2-12.) Stern also testified that Simple Solutions consistently reassured him that CEO's data was backed up, even going so far as to tell Stern that there was no need for him to store backups of the data on his personal computer. (*Id.* 84:7-17; 85:8-18; 88:5-10.)

In February 2019, Simple Solutions advised CEO that a routine server upgrade was necessary on the server that supported the CEO website. (Pl. St. ¶29; Def. Resp. ¶29.) The upgrade was ultimately scheduled for April 23, 2019. (Pl. St. ¶29; Def. Resp. ¶29.) While the upgrade was being performed, the server that supported the CEO website crashed twice, and both hard drives on which CEO's data was stored crashed. (Pl. St. ¶30; Def. Resp. ¶30.)

Simple Solutions was able to restore part of the CEO website by using a backup of the database that Simple Solutions had created and sent to CEO in June 2017, in conjunction with backup files from earlier in time that contained the website code. (Weeks Dep. 156:21-157:7; Stern Supp. Decl. ¶28.) Over the course of their working relationship, Simple Solutions created multiple backups of the CEO website, sometimes at Stern's request and other times in preparation for a significant change to the technology, such as a server upgrade. (*Id.* 88:12-89:12.) Those backups were stored on the dedicated server and sent to Stern if he requested them (*Id.* 89:13-15; 159:10-14.). In 2013, when the parties stopped working together on a monthly basis, Weeks created those backups less frequently. (*Id.* 95:2-12.) Weeks was in the process of creating a manual backup of the CEO site when it crashed in April 2019. (*Id.* 135:10-17; Def. St. ¶30; Pl. Resp. ¶30.)

By April 30, 2019, Simple Solutions expended 25 hours attempting to recover CEO's data. (Def. St. ¶31; Pl. Resp. ¶31.) After Simple Solutions sent a bill to CEO for the hours expended and advised that it could make the CEO website fully operational with an additional 10 hours of work, CEO issued a stop work order. Simple Solutions has not performed work on CEO's behalf

6

since May 1, 2019. (Def St. ¶32; Pl. Resp. ¶32.)

According to Stern, the server crash resulted in the loss of nearly two years' worth of data, including all of CEO's member information, school information, and essay requirement information. (Stern Supp. Decl. ¶27.) This rendered the site effectively useless because there was no way to know which colleges had updated their admissions criteria and essay requirements since 2017 without researching each one individually. (*Id.* ¶31.)

Simple Solutions disputes that CEO's data is permanently lost. Weeks testified that he downloaded the corrupted database and that it is possible that a full export could be retrieved with data recovery methods that are outside of his expertise. (Weeks Dep. 162:23-164:7.) According to Stern, however, Simple Solutions informed him after the incident that certain data had been permanently lost and did not mention any steps that could be taken to recover it. (Stern Opp. Decl. ¶27; Stern Dep. 111:3-8.) Stern never contacted Lunarpages or any other contractor to see if anything could be done to recover the lost data. (Stern Dep. 127:12-19.)

## II.     Legal standards

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)).

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by

'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "Opinion testimony that would be admissible at trial may be considered." *PNC Bank, Nat'l Ass'n v. Liberty Mut. Ins. Co.*, 912 F. Supp. 169, 177 (W.D. Pa.), aff'd sub nom. PNC *Bank Nat. Ass'n v. Liberty Mut. Ins. Co.*, 101 F.3d 691 (3d Cir. 1996) (citing *Paton v. La Prade*, 524 F.2d 862, 871 (3d Cir.1975)).

### III. Discussion

#### A. Plaintiffs' motion for partial summary judgment

The plaintiffs move for summary judgment on the issue of liability on their negligence claim. According to the plaintiffs, Simple Solutions owed a duty of care to both CEO and MAP to protect CEO's valuable and proprietary data upon which MAP's business relied. (Pl. Repl. 3.) Simple Solutions breached this duty when it implemented a server architecture that put CEO's data at an unreasonable risk of loss that was realized in April 2019. (*Id.*)

To sustain a cause of action for negligence, a plaintiff must prove four elements: (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) damages.[2] *Polzo v. Cnty. of Essex*, 196 N.J. 569, 584 (2008). Because genuine issues of fact remain that bear on these elements, I will deny summary judgment on the negligence claim.

Whether Simple Solutions owed the plaintiffs a duty of care is a question of law for the Court. *Clohesy v. Food Circus Supermarkets, Inc.*, 149 N.J. 496,

---

[2] Because plaintiffs seek summary judgment as to liability only, the fourth element of damages is not at issue.

502 (1997) (citations omitted). In New Jersey, it is well-settled that "there is no bright line rule that determines when one owes a legal duty to prevent a risk of harm to another." *Wlasiuk v. McElwee*, 334 N.J. Super. 661, 666 (App. Div. 2000). Rather, "'duty' is a fluid concept." *Id.* (Quoting *Hopkins v. Fox and Lazo Realtors,* 132 N.J. 426, 439 (1993)). "The imposition of a duty depends on the interplay of many factors, including: (1) the relationship of the parties; (2) the nature of the attendant risk; (3) the ability and opportunity to exercise control; (4) the public interest in the proposed solution; and, most importantly; (5) the objective foreseeability of harm." *Wlasiuk, supra* (citing *Alloway v. Bradlees, Inc.,* 157 N.J. 221, 230 (1999)). "In deciding whether to impose a duty, these factors must be 'identified, weighed and balanced' by the court." *Wlasiuk, supra* (citing *Alloway*, *supra*).

  It is undisputed that CEO and Simple Solutions had a business relationship of some sort in 2016, when the CEO website and database were moved from a virtual server to a dedicated server utilizing a mirrored RAID configuration. The precise nature of that relationship is not clear from the record—Stern stated in a declaration that the independent contractor Agreement was still in place at the time (Stern Opp. Decl. ¶¶18-19), while Cameron testified that the Agreement was abandoned in 2013 when CEO stopped paying Simple Solutions a monthly retainer (Cameron Dep. 65:4-9, 66:15-67:8). Nonetheless, it is clear that CEO paid Simple Solutions for web development work that it performed between 2013 and 2019 (Stern Dep. 34:1-10; Cameron Dep. 69:8-15), and Simple Solutions does not dispute that it also acted as the liaison between CEO and Lunarpages once the latter began hosting the CEO website (Def. Opp. 2; Weeks Dep. 164:21-165:19).

  The record suggests that in its role as liaison, Simple Solutions not only communicated with Lunarpages on CEO's behalf regarding CEO's server needs, but also provided guidance to CEO related to its decision to switch to a dedicated server with a RAID configuration. (Weeks Dep. 110:3-8, 112:19-113:16.) Weeks testified that he answered all of Stern's questions regarding the

9

switch and "made sure that [Stern] understood the differences between the architecture so that he could have made a decision about how to adjust things if he wanted to." (*Id.* 112:19-113:16.) Stern similarly testified that he relied on Weeks's expertise when it came to the "Lunarpages options." (Stern Dep. 92:23-93:14.)

Thus, the record demonstrates that in addition to providing web development services, Simple Solutions acted as a technology advisor to CEO when it came to CEO's hosting needs. Given that a functioning server is essential to the operation of a website and that the choice of server architecture impacts the risk of data loss, it is reasonable to impose a duty of care on Simple Solutions with respect to the technological advice it provided.

The duty of care that I recognize is narrower than the one claimed by plaintiffs. According to plaintiffs, Simple Solutions had a generalized duty to protect CEO's data from catastrophic loss, but such a broad duty is beyond the scope of the parties' relationship. Simple Solutions was not hired to be CEO's information security manager, and it was (nonparty) Lunarpages that hosted the CEO website. Rather, Simple Solutions undertook to help CEO meet its technological needs by providing information about the available hosting options, and can reasonably be charged with a duty to perform that function with due care. The ultimate decision of what technology to utilize, however, was CEO's to make. (Stern Dep. 82:1-7; Weeks Dep. 60:19-22, 130:1-3.)

Whether Simple Solutions owed a duty of care to MAP, separate and apart from that which it owed to CEO, is an issue that cannot be decided on the basis of the undisputed record. Although CEO argues that Simple Solutions "was aware of the relationship between MAP and CEO and was aware that MAP relied extensively on the CEO website in the course of its business," Cameron testified that she did not have an understanding of the nature of the relationship between MAP and CEO in 2017. (Cameron Dep. 60:24-61:3.) She further testified that while she understood that the changes to CEO's business model were being made "for MAP purposes," she did not know what those purposes were. (*Id.* 60:6-15.) Weeks, who personally worked on taking the CEO

website private in 2017, testified that he knew Stern would continue to use the site for "the CEO students," but he did not know whether those students were customers of MAP. (Weeks Dep. 45:4-46:7.) I cannot resolve the dispute over whether and to what extent Simple Solutions owed MAP a duty of care on this record.

Having determined that Simple Solutions owed a duty of care to CEO, at least, with respect to the technological advice it provided, I now turn to the issue of breach. According to the plaintiffs, Simple Solutions breached its duty to CEO by recommending that CEO utilize a dedicated server; failing to explain to CEO that, by making this change, CEO would be entirely dependent on a mirrored RAID system without an external backup; and failing to create manual back-ups of CEO's data that would be stored on a separate server and used in case of catastrophic failure. (Pl. Br. 8-10.)

Starting with the third of these allegations, the record does not establish that creating and storing manual backups of CEO's data was within the scope of the duty of care that Simple Solutions owed. CEO points to a provision in the Agreement that required Simple Solutions to "maintain redundant backups of data (code/database) on a regular basis," (Agr. at 5) but whether this Agreement remained in force in 2017 is in dispute. Assuming *arguendo* that the Agreement was in force, Simple Solutions may be liable for breach of contract. But a tort duty of care does not arise from a contract provision as such. *See Saltiel v. GSI Consultants, Inc.,* 170 N.J. 297, 316 (2002) ("Under New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law.") Thus if the Agreement *was* in force in 2017, CEO would not be able to proceed on a theory that Simple Solutions was negligent in failing to comply with the Agreement. The economic loss doctrine "precludes tort claims where the allegedly tortious conduct is intrinsic to the contract—*i.e.*, where the alleged tort consists of the breach of a contractual promise." *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 159 (D.N.J. 2013).

11

It is possible that Simple Solutions as adviser breached its duty of care by recommending that CEO utilize a dedicated server without explaining that this would entail that CEO's data was not backed up anywhere else. There is an issue of fact, however, as to whether Simple Solutions failed to convey this information. As discussed above, Weeks testified that he would have explained the differences in server architecture to Stern to make sure that Stern's decision to utilize a dedicated server was informed. (Weeks Dep. 112:19-113:16.) Weeks also testified that although CEO's reliance on the mirrored RAID configuration meant that "[t]here was no external source of data should a catastrophe strike that affected both the hard drives," "there were numerous instances where [Simple Solutions] communicated with [Stern] about how to ensure the integrity of the data beyond – and the functionality of the website." (*Id.* 111:13-20.) According to Weeks, Stern never pursued those options. (*Id.* 20-24.)

Nor does the record establish that the recommendation to utilize a dedicated server was, in itself, a breach of Simple Solutions' duty of care. In advancing this argument, plaintiffs rely on the sworn declaration of their IT expert, Alon Israely. Israely stated that "[b]y maintaining both aspects of the website on the same hardware, Simple Solutions created a dangerous architecture with a single point-of-failure. This created an unnecessary and unreasonable risk of loss in the event anything happened to corrupt or destroy the hardware containing all of the data necessary to create the CEO website." (Israely Decl. ¶9.) Israely further averred that this data storage system "did not comply with commonly accepted industry standards." (*Id.* ¶10.)

Israely's declaration is rebutted by an expert report submitted by Simple Solutions. According to Simple Solutions' IT expert, Philip Greenspun, a single server is appropriate for a lightly used website such as CEO's. (Greenspun Rep. ¶92.) Moreover, it is not necessarily more reliable to store the database and website on two separate physical computers, as doing so "doubles the chance of a failure (since if either machine suffers a failure, the site will become unstable)." (*Id.* ¶93.)

12

Greenspun's report is consistent with the testimony of Weeks, who personally advised CEO with respect to its decision to move to a dedicated server. When asked whether he is aware of preventative measures that can be taken to minimize data loss as a result of mirrored RAID failures, Weeks testified that "the probability of one drive failing is very small, especially when it comes to server hardware. And the probability of both drives failing within the same window of time is unbelievably low." (Weeks Dep. 146:3-7.) This testimony explains why, as Stern testified, Weeks told Stern that it was not necessary for him to store backups on his personal computer. (Stern Dep. 115:4-6.)

Because genuine issues of fact remain as to whether Simple Solutions breached its duty of care to CEO, I need not examine whether any such breach caused the loss of CEO's data, as plaintiffs claim. I note, however, that there is a genuine dispute over whether CEO's data is, in fact, irretrievable. Greenspun opined in his report that "[i]t is possible that an effort costing under $10,000 could have restored all of the files and databases that were resident on the RAID." (Greenspun Rep. ¶98.) Of course, CEO may have still suffered damages even if its data is recoverable and may argue in addition that it should not have been charged for recovery of the lost data it entrusted to others. Should this case proceed to trial, a jury will assess the amount of damages that may be attributed to Simple Solutions' conduct, if any.

### B. Defendant's motion for partial summary judgment
#### i. MAP's breach of contract claim

Simple Solutions moves for summary judgment on the breach of contract claim asserted by MAP. According to Simple Solutions, MAP may not bring such a claim because it is neither a party to nor an intended beneficiary of the contract between Simple Solutions and CEO. (Def. Mot. 3-5.)

To state a claim for breach of contract, a plaintiff must allege "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir.

2007) (citing *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.,* 210 F.Supp.2d 552, 561 (D.N.J. 2002)). If a plaintiff is not a party to a contract, it may nevertheless recover damages for breach if it can establish that it is an intended third-party beneficiary of the contract.

"A plaintiff asserting third party beneficiary status must establish that the contract was 'made for the benefit of that third party within the intent and contemplation of the contracting parties.'" *Grand St. Artists v. Gen. Elec. Co.,* 19 F. Supp. 2d 242, 253 (D.N.J. 1998) (quoting *Grant v. Coca–Cola Bottling Co.,* 780 F.Supp. 246 (D.N.J. 1991)). "New Jersey courts have made the contractual intent to recognize a right to performance in the third person the key analytical factor." *Grand St., supra* (citing *Broadway Maintenance Corp. v. Rutgers,* 90 N.J. 253, 259 (1982)). "Without the requisite intent, the third person is merely an incidental beneficiary without contractual standing." *Grand St., supra.*

Thus, it is not enough that a plaintiff shows that "the contracting parties acted against a backdrop of knowledge that the plaintiff would derive benefit from the agreement." *Grand St.,* 19 F. Supp. 2d at 253 (citation omitted). "The plaintiff must show the benefit to the plaintiff was a *consequence the parties affirmatively sought*; in other words, the benefit to plaintiff must have been, to some extent, a *motivating factor* in the parties' decision to enter the contract." *Id.* (Emphasis added, citations omitted.) *See Borough of Brooklawn v. Brooklawn Hous. Corp.,* 124 N.J.L. 73, 76 (1940) ("It is not enough that the plaintiff may be benefited by the performance of the contract. He can only maintain the action when the contract is made for him.").

"Divining the intent of a contract is ordinarily a question of law, making cases involving contract interpretations . . . particularly suited to disposition by summary judgment." *Labega v. Joshi,* 470 N.J. Super. 472, 486 (App. Div. 2022) (citations omitted). "Absent ambiguity, the intention of the parties is to be ascertained by the language of the contract." *CSFB 2001-CP-4 Princeton Park Corp. Ctr., LLC v. SB Rental I, LLC,* 410 N.J. Super. 114, 120 (App. Div. 2009).

Where the language is ambiguous, New Jersey courts consider the surrounding circumstances of the agreement. *See Grand St.*, 19 F. Supp. 2d at 253.

In this case, the Agreement evidences no shared intent to benefit MAP. MAP is not mentioned anywhere in its provisions or exhibits, and the Agreement provides that it "constitutes the entire agreement of the parties pertaining to the subject matter"—*i.e.*, Simple Solutions' performance of contracting work for CEO. (Agr. ¶12.) CEO contends that the contract need not necessarily name the third party, but the case it cites is not helpful. In *Borough of Brooklawn,* the court concluded that even though the plaintiff in the matter *was* specifically mentioned in the contract and would clearly benefit from contract performance, the plaintiff still was not an intended beneficiary because it was clear that the contracting parties did not intend for it to have the right to enforce the contract terms. 124 N.J.L. at 77.

CEO nevertheless points to circumstantial evidence that the parties, though they did not name MAP, intended that the contract benefit MAP. CEO points to Stern's testimony that the contract was originally drafted as one between Simple Solutions and MAP and that Stern had it changed to one between Simple Solutions and CEO "for legal purposes." (Stern Dep. 22:22-23:4.) Stephanie Morris, the Director of Operations at MAP, testified similarly that "originally they had put MAP on [the] contract, and then it was changed to CEO." (Morris Dep. 30:7-8.) CEO also highlights Stern's testimony that he "made very clear" to Simple Solutions "from the beginning that the vision for CEO was to drive business to A-List, to MAP . . . and to any other partners that we choose to work with or ultimately sell to." (Stern Dep. 21:21-25.)

I agree with CEO that this evidence suggests that Simple Solutions was aware that MAP would benefit from the contract and that CEO intended this result. At most, however, this evidence if believed would establish MAP as an incidental beneficiary of the contract. Critically, it does not suggest that the parties intended to bestow upon MAP the right to enforce the contract, which would render MAP an intended beneficiary. *See Rieder Communities, Inc. v.*

15

*Twp. of N. Brunswick*, 227 N.J. Super. 214, 222–23 (App. Div. 1988) (affirming dismissal of breach of contract claim where there was "nothing in the agreement nor in the surrounding circumstances to indicate that [plaintiffs] were intended to have the right to enforce the obligations of the contract or to sue for damages allegedly arising from a breach of the contract"); *Labega*, 470 N.J. Super. at 487 (reversing trial court's denial of summary judgment to defendants on breach of contract claim where the evidence showed that the contracts intentionally benefitted plaintiffs but failed to show that plaintiffs were intended to "have the right to sue to enforce those obligations imposed by the contracts").

If anything, Stern's insistence that both sides knew about the benefit "from the beginning" tends to suggest that the parties' omission of MAP from the contract was purposeful—*i.e.,* that the parties did *not* seek to give MAP the right to sue to enforce the contract or to recover damages for breach. Both sides were represented by counsel in the negotiation of the contract, and Stern acknowledges that the parties spent "a good deal of time negotiating back and forth together on all the terms." (Stern Dep. 23:4-15.) Yet CEO has offered no explanation regarding the parties' failure to designate MAP as an intended beneficiary if that was their intent. Assuming that MAP was top of mind during the contracting process, as CEO claims it was, the absence of such a term from a contract thoroughly negotiated by counsel is almost inexplicable.

In sum, there is insufficient evidence in the record to support a conclusion that MAP is an intended beneficiary of the Agreement. I will therefore grant CEO's motion for summary judgment with respect to MAP's third party breach of contract claim.

### ii. Plaintiffs' expert reports

Simple Solutions has moved to bar the admission of reports authored by plaintiffs' experts, Alon Israely and Brian C. Hedges, as well as Israely's deposition testimony, on the grounds that they lack a proper foundation. The Israely report and testimony concern Simple Solutions' liability for the loss of

16

CEO's data, while the Hedges report concerns the amount of damages that MAP has suffered as a result of the April 2019 incident.

At this juncture, I do not find it necessary to decide whether this evidence may be put before a jury. The Hedges report has no bearing on whether plaintiffs are entitled to summary judgment on the negligence claim or whether Simple Solutions is entitled to summary judgment on the breach of contract claim. As for Israely's expert opinion, even assuming it is admissible, it would not affect my denial of summary judgment to plaintiffs on the negligence claim, as Simple Solutions has produced evidence from its own expert that creates a genuine issue for the jury. And Israely's opinion does not bear on whether MAP has a legitimate breach of contract claim against Simple Solutions.

Should the case proceed to trial, I will consider a properly filed motion *in limine* to bar the admission of the Hedges report and the Israely report and testimony. At this time, I will deny Simple Solutions' summary judgment motion insofar as it seeks this result.

## IV.   Conclusion

For the reasons set forth above, plaintiffs' motion for partial summary judgment is **DENIED** and defendant's motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART**. MAP's breach of contract claim against Simple Solutions is dismissed. All other claims asserted in the complaint remain. An appropriate order will issue.

Dated: July 28, 2023

/s/ Kevin McNulty

_____

**KEVIN MCNULTY**
**United States District Judge**